UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

B.W.A., a minor, et al.,           )
                                   )
        Plaintiffs,                )
                                   )
    vs.                            )        Case No. 4:06-CV-1691 (JCH)
                                   )
FARMINGTON R-7 SCHOOL DISTRICT,    )
et al.,                            )
                                   )
        Defendants.                )

**MEMORANDUM AND ORDER**

The matter is before the Court on Defendants' Motion for Summary Judgment, filed June 8,

2007. (Doc. No. 31). The matter is fully briefed and ready for a decision.

**BACKGROUND**

Plaintiff BW.A.[1] ("B.A.") was a student at Farmington High School ("Farmington High"),

which is part of Defendant Farmington R-7 School District ("District"). (Defs.' Statement of

Uncontroverted Facts ("Defs.'Facts"), Doc. No. 31 ¶¶ 1, 7). Plaintiffs R.S. and S.B.[2] are students

at Farmington High. (Id. ¶¶ 9-10). Defendant W.L. Sanders ("Sanders") is the District's

Superintendent. (Id. ¶ 2). Defendant Judith DeLany is the District's Assistant Superintendent. (Id.

¶ 3). Defendant Todd McKinney ("McKinney") is the Dean of Students at Farmington High. (Id. ¶

6). Defendant Susan Barber ("Barber") is the Assistant Principal at Farmington High. (Id. ¶ 5).

---

[1]Plaintiffs Tamra and Marc Archambo are the next friends of B.A. (Am. Compl., Doc. No.
20).

[2]Plaintiff Opal Scaggs is the next friend of R.S., and Plaintiff Patricia Hill is the next friend of
S.B. (Am. Compl., Doc. No. 20).

Finally, Defendant Mark Krause ("Krause") is a teacher at Farmington High. (Id. ¶ 4). This cause of action arose during the 2006-2007 school year after Defendants punished Plaintiffs B.A., S.B., and R.S. ("Plaintiffs") for wearing clothing depicting the Confederate flag at Farmington High.

**A.    The District's Dress Code and Prior Relevant Incidents**.

In 1995, the District adopted a student dress code. (DeLany Aff., Doc. No. 31 Ex. 1). This dress code states:

> The Board of Education recognizes the value of allowing individual student expression as well as the necessity of protecting student health and safety and maintaining an atmosphere conducive to education. Student dress code procedures must be designed with the goal of balancing these competing interests.

> All dress code procedures will adhere to health and safety codes and comply with applicable law. Dress that materially disrupts the educational environment will be prohibited. No procedure will impose dress and grooming rules based on gender in violation of Title IX. District procedures will specifically define ambiguous terms, and examples will be provided when practical.

(Id.). The Farmington High School Student and Parent Information Guide, which every student received at the beginning of the 2006-2007 school year, contained this dress code. (Defs.' Facts ¶¶ 12, 15). In January 2006, Sanders told District administrators that the Confederate flag was a symbol prohibited by the dress code. (Id. ¶ 13). Sanders testified that incidents within the District, which he believed were race-related, prompted this decision. (Sanders Dep., Doc. No. 31 pg. 51). David Waters, the Farmington High Principal, told his staff that racial statements and symbols were not to be tolerated. (Defs.' Facts ¶ 14).

Prior to the 2006-2007 school year, three notable racially related incidents occurred in the District. In May 2005 a white student, in the presence of two other white students, urinated on a black student while allegedly saying "that is what black people deserve." (Reid Aff., Doc. No. 31 ¶

6).[3] An investigation by the District confirmed that the white student urinated on the black student, but could not confirm that the white student made a racial remark because the three white students either denied that one was made or denied hearing anything. (Id. ¶ 7). This incident prompted the black student's mother to remove her son from the District because she no longer felt that it was a "good educational environment" for him. (Id. ¶ 8).

The second incident occurred on September 9, 2005 when white students from Farmington High showed up at the home of Laricco Welch ("Welch"), a black student at Farmington High. (Welch Aff., Doc. No. 31 ¶¶ 4-6). One of the white students had a swastika tattoo and one was carrying an aluminum baseball bat. (Id. ¶ 6). They made racial remarks to Welch, such as "anything that is not white is beneath them." (Id.). Although Welch's mother tried to separate the boys, one of the white student hit her in the eye, causing a fight between Welch and the white students. (Id. ¶ 7). Following this fight, "people" drove around Welch's home "screaming racial statements and threatening to burn [the] home down." (Id. ¶ 8). On September 12, 2005, a group of white students surrounded Welch and confronted him at Farmington High. (Id. ¶ 9). Welch and his family moved out of the District as a result of these incidents. (Id. ¶¶ 10-11). Sanders testified that he was not sure what prompted these confrontations, but believed an argument between Welch and a white student triggered them. (Sanders Dep., Doc. No. 33 pg. 15-16). The District investigated the incidents, but could not conclusively determine what caused them. (Id. pg. 16).

In December 2005, a fight broke out a during a basketball game between Farmington High and Festus Senior High School.[4] (Sanders Dep., Doc. No. 31 pg. 19-21). The fight started after

---

[3]The students involved were in the third or fourth grade. (Sanders Dep., Doc. No. 31 pg. 9). Following this incident, the white student was kept out of school for a month. (Id.).

[4]This incident occurred in Festus, Missouri.

players from Farmington High allegedly directed racial slurs towards two black players from Festus. (<u>Id.</u>). The District did not discipline any of its players because its investigation was inconclusive. (<u>Id.</u> pg. 27).

The Festus students filed a report with the Missouri State High School Activities Association. (<u>Id.</u> pg. 20). Supporters of the Festus students circulated a flyer in the Festus area condemning the District for its handling of this incident. (<u>Id.</u> pg. 21-24). The local Festus newspaper wrote an editorial that was "very critical" of the District. (<u>Id.</u> pg. 24-25). Finally, the Festus students contacted the United States Department of Justice's Office of Civil Rights ("OCR"). (<u>Id.</u> pg. 25). As part of its investigation, the OCR interviewed six coaches and administrators from the District. (<u>Id.</u>). In August 2005, the Festus School District informed the District that, as part of an agreement with the OCR, it was sending the District a letter stating that two white students from Farmington High had directed racial slurs towards two of Festus' black players. (<u>Id.</u>). The letter asked the District to take steps to prevent any further incidents. (<u>Id.</u>). Because of this incident, the Festus and Farmington high school basketball teams no longer play each other unless the game is required by their athletic conference. (<u>Id.</u> pg. 29). Extra security is present at these games due to continuing tensions over the incident. (<u>Id.</u>).

Other racial incidents occurred at Farmington High prior to the 2006-2007 school year.[5] On December 5, 2005, school officials punished a white student for drawing swastikas and writing "white power"[6] song lyrics in his notebook. (Barber Aff., Doc. No. 31 Ex. 2 pg. 7). On December 15, 2005,

---

[5]Approximately 1100 students attend Farmington High and only fifteen to twenty are black. (Sanders Dep., Doc. No. 31 pg. 7-8).

[6]The lyrics stated: "whites are superior, niggers are less/ fuck with honkeys, fuck with the best/ niggers will fall/ niggers faces will be a mess."

a white student scolded[7] another student for loaning his portable video game system to a black student. (Id. pg. 1). On February 9, 2006 and March 10, 2006, school officials punished students for making racial slurs. (Id. pg. 5-6). On March 23, 2006, school officials disciplined a white student for yelling "white power" during class three times. (Id. pg. 9). On March 29, 2006, a white student told his teacher that the "niggers [are] here" and pointed at a visiting track team. (Id. pg. 8). The student also drew a swastika on the chalkboard. (Id.). On April 26, 2006, a student stated that he "work[s] like a nigger and nobody cares." (Id. pg. 4).

## B.    Incidents Involving Plaintiffs

The first incident giving rise to this action occurred at Farmington High on September 27, 2006 when B.A. wore a hat depicting the Confederate flag with the words "C.S.A., Rebel Pride, 1861" written on it. (Am. Compl. ¶ 16). Krause saw the hat and told B.A. he could not wear it. (Defs.' Facts ¶ 43). McKinney told B.A. the same thing. (Barber Aff., Doc. No. 31 Ex. 1). Barber then met with him and told him he could not wear the hat because some people view the Confederate flag as a symbol of racism. (Id.). He was allowed to keep the hat in his backpack for the rest of the day. (Id.). Later that day, B.A's father, Marc Archambo ("Archambo"), called Barber about the hat and complained that "they have more rights than we do." (Defs.' Facts ¶ 50). Archambo told Barber that wearing the hat was the "only thing that made [B.A.] happy, and that [B.A.] was going to continue to wear them."(Barber Aff., Doc. No. 31 Ex. 1).

The next day, B.A. came to Farmington High wearing a T-shirt and belt buckle containing an image of the Confederate flag and the words "Dixie Classic." (Am. Compl. ¶ 21). McKinney stopped B.A. and told him he could not wear that clothing. (Pls.' Uncontroverted Statement of Facts, Doc. No. 33 ¶ 53). B.A. then spoke with Barber, who told him to remove the belt buckle and turn

---

[7]The student said, "I told you never to loan my stuff to a black man."

his T-shirt inside out. (Barber Aff., Doc. No. 31 Ex. 1). When B.A. refused, Barber told him that he had to go home for the rest of the day. (Id.). That day, B.A.'s mother, Tamra Archmbo, withdrew him from school. (Id.).

B.A's. withdrawal from Farmington High affected its atmosphere. Protestors began gathering outside the school to display the Confederate flag. (Caruthers Aff., Doc. No. 31 ¶ 7). Some students believed that these protests increased racial tensions inside Farmington High. (Id. ¶ 8; Glaspy Aff. Doc. No. 31 ¶ 8). The walls of a new bathroom were vandalized after someone wrote "racial slurs" on them. (Defs.' Facts ¶ 78). This graffiti resulted in several hundred dollars of damage. (Id.). On November 29, 2006, a student was punished for telling a black student that he was "a monkey crawling across the seats of the bus." (Barber Aff., Doc. No. 31 Ex. 2 pg. 3). In January 2007, the District allowed a black student to leave Farmington High because he was "uncomfortable due to the racial tension." (Defs.' Facts ¶ 81).

On January 10, 2007, R.S. wore a shirt to school stating "The South was right[,] Our school is wrong," and in the letters it had "the rebel flag kind of." (R.S. Dep., Doc. No. 31 pg. 3). After being sent to the office, Barber ordered R.S. to remove his shirt or turn it inside out. (Am. Compl. ¶ 33). R.S. refused to comply and was suspended for the rest of the day. (Id.). The next day, R.S. wore a shirt with the slogan "Our school supports freedom of speech for all (except Southerners)."(Id. ¶ 34). R.S. was told that he could not wear the shirt and to leave school if he would not remove it. (R.S. Dep., Doc. No. 31 pg. 11). R.S. left the school and came back in a shirt from "Dixie Outfitters." (Defs.' Facts ¶ 69). R.S. was allowed to wear this shirt because it did not depict the Confederate flag. (Id.).

On January 12, 2007, S.B. wore a shirt to school containing the Confederate colors and stating "Help Support B[.A.] Once a rebel, always and forever a rebel. We love B.[A.]." (Am. Compl.

¶ 27). McKinney told S.B. she could not wear the shirt and had to turn it inside out. (Defs.' Facts ¶ 72). When she refused to comply, she was suspended for the rest of the day. (Id. ¶¶ 73-74).

## C.   **Procedural History**

On November 21, 2006, B.A. filed this 42 U.S.C. § 1983 action claiming that Defendants violated his First Amendment rights by refusing to let him wear the Confederate flag at school. (Compl., Doc. No. 1).[8] On March 8, 2007, B.A. amended his Complaint by adding R.S. and S.B. as Plaintiffs. (Doc. No. 20). Plaintiffs seek a declaratory judgment holding that they have a First Amendment right to wear the Confederate flag at school. (Id. ¶¶ 38-43). They also ask for an injunction prohibiting Defendants from banning the display of the Confederate flag in the District. (Id. ¶¶ 44-46).

Defendants filed their Motion for Summary Judgment on June 8, 2007. In this motion, Defendants allege that Plaintiffs had no right to display the Confederate flag at Farmington High because the District had reason to believe that its display would cause a material and substantial disruption. (Memo. in Supp., Doc. No. 31 pg. 6). Additionally, Defendants allege that it properly prevented Plaintiffs from wearing Confederate clothing because it has a duty to maintain an "educational environment that prepares children for citizenship." (Id. at 10). Plaintiffs respond that fact issues remain about the likelihood of the clothing causing a material disruption and that the citizenship standard is inapplicable. Plaintiffs also allege that Defendants violated Missouri law. (Resp., Doc. No. 33 pg. 4-9).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[8]This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.

## DISCUSSION

### I.     Ban on Confederate Flag Clothing was Constitutional.

As previously stated, Plaintiffs' claims raise the issue of whether a public school student has a First Amendment right to wear the Confederate flag at school. Outside of the school setting, displaying the Confederate flag on clothing is speech protected by the First Amendment. See Castorina v. Madison County Sch. Bd., 246 F.3d 536, 539-40 (6th Cir. 2001); see also Virginia v. Black, 538 U.S. 343, 365 (2003) (holding political speech "is at the core of what the First

Amendment protects."). It is well settled law that public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969). The constitutional rights of public school students, however, "are not automatically coextensive with the rights of adults in other settings," because the Constitution does not compel "teachers, parents, and elected school officials to surrender control of the American public school system to public school students." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682, 686 (1986) (quoting Tinker, 393 U .S. at 526 (Black, J., dissenting)). Therefore, courts must analyze First Amendment violations alleged by students "in light of the special characteristics of the school environment." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) (quoting Tinker, 393 U.S. at 506).

In Tinker, the Supreme Court held that students are entitled to freedom of expression of their views, unless a prohibition on speech is "necessary to avoid material and substantial inference with schoolwork or discipline." Tinker, 393 U.S. at 511. As such, a school cannot punish a student for expressing his personal views on the school's premises unless "school authorities have reason to believe that such expressions 'will substantially interfere with the work of the school or impinge upon the rights of other students.'" Hazelwood, 484 U.S. at 266 (quoting Tinker, 393 U.S. at 512-13). An "undifferentiated fear or apprehension" of a disturbance is not enough. West v. Derby Unified Sch. Dist., 206 F.3d 1358, 1366 (10th Cir. 2000) (quoting Tinker, 393 U.S. at 508). Rather there must be "substantial facts which reasonably support a forecast of likely disruption." See Phillips v. Anderson County Sch. Dist. No. 5, 987 F. Supp. 488, 492 (D. S.C. 1997) (quoting Quarterman v. Bryd, 453 F.2d 54, 58 (4th Cir. 1971)). School officials, however, need not wait for an actual disruption to occur. Chandler v. McMinnville Sch. Dist., 978 F.2d 524, 529 (9th Cir. 1992). Finally,

even if past racial incidents justify a ban, a school may not impose "a viewpoint specific ban on [some] racially divisive symbols and not others." Castorina, 246 F.3d at 544.[9]

In Frazer, the Supreme Court, while considering whether the First Amendment protected lewd and vulgar speech at school, held that the Tinker standard is not the exclusive method for determining when restrictions on student speech violate the constitution. See Morse v. Frederick, 127 S. Ct. 2618, 2626-27 (2007). Frazer held that, even if disruption is not immediately likely, school officials are charged with the duty to "inculcate the habits and manners of civility as values conducive both to happiness and to the practice of self-government." See Scott v. Sch. Bd. of Alachua County, 324 F.3d 1246, 1248 (11th Cir. 2003). To fulfill this duty, they must have the flexibility to control the tenor and contours of student speech within school walls or on school property, even if such speech does not result in a reasonable fear of immediate disruption. See id.

Frazer, however, is a limited exception to Tinker that applies only when the speech is "lewd, vulgar, and plainly offense" and "speaks to the form and manner of the speech, not the substance." See Newsom ex rel. Newsom v. Albemarle County Sch. Bd., 354 F.3d 249, 256 (4th Cir. 2003) (collecting authority to support this proposition). Here, Frazer is inapplicable because displaying the Confederate flag is not patently offensive. Rather, the Confederate flag is a historical and political symbol that can be interpreted as either a symbol of southern heritage or a symbol of slavery and white supremacy. See Bragg v. Swanson, 371 F. Supp. 2d 814, 823 (W.D. W. Va. 2005) (quoting Scott, 324 F.3d at 1248-49). As such, the Court will apply Tinker to the case at bar.

---

[9]Plaintiffs allege that Defendants engaged in viewpoint discrimination when they banned the Confederate flag but not any other symbol. This allegation overstates the relevant inquiry, which is whether Defendants singled out the Confederate flag "for special treatment while allowing other controversial racial and political symbols to be displayed." See Castorina, 246 F.3d at 542. Plaintiffs have provided the Court with no evidence that Defendants engaged in such behavior.

Whether the First Amendment protects the rights of Plaintiffs to wear a Confederate flag at school is an issue of first impression in the Eighth Circuit, but the Sixth, Tenth, and Eleventh Circuits have considered it. In <u>Melton v. Young</u>, the Sixth Circuit held that a school did not violate the First Amendment by preventing a student from displaying the Confederate flag due to the school's history of racial tension. 465 F.2d 1332, 1333-1335 (6th Cir. 1972). Specifically, prior displays of the flag "most materially disrupted the functioning of the school" by causing protests, closing the school on two occasions, requiring the police to be summoned, and instituting a citywide curfew. <u>Id.</u> at 1335. Recently, the Sixth Circuit held that a school could ban a student from displaying the Confederate flag because "school officials could reasonably surmise that such displays posed a substantial risk of provoking problems in the incendiary atmosphere then existing." <u>D.B. ex rel. Brogdon v. Lafon</u>, 217 Fed. Appx. 518, 523 (6th Cir. 2007). There, past incidents included sheriff's deputies patrolling the school due to threats of violence against black students and a fight between a white and black student that led to a civil rights complaint against the school. <u>Id.</u> at pg. 521-22; <u>Phillips</u>, 987 F. Supp. at 490-83 (holding past physical altercations between the races justified banning the Confederate flag). Conversely, the Sixth Circuit reversed a summary judgment in favor of the school where there was evidence that the ban was viewpoint specific and fact issues remained about past racial incidents. <u>Castorina</u>, 246 F.3d at 541; <u>see Bragg</u>, 371 F. Supp. 2d at 827 (finding that no substantial disruption was likely to occur because "there exists at the school an environment in which people of both races mix freely together and form good relationships.").

The Tenth Circuit upheld a school's decision to ban the Confederate flag because the school district had a history of racial tension. <u>West</u>, 206 F.3d at 1366. Past racial incidents included "verbal" confrontations between white and black students, at least one fist fight, racist graffiti, and the Ku Klux Klan passing out racist literature. <u>Id.</u> at 1362; <u>see Sypniewski v. Warren Hills Regional Bd. of</u>

Educ., 307 F.3d 243, 254-55 (3d Cir. 2002) (suggesting that it would uphold a ban of the Confederate flag in a similar situation). The Eleventh Circuit found that fights "which appeared to be racially motivated" gave school officials a sufficient basis to ban the Confederate flag's display. See Scott, 324 F.3d at 1249; accord White v. Nichols, No. 02-1712-CV-P-NE, 2006 WL 1594213 (11th Cir. June 12, 2006).

Courts have articulated other relevant principles. First, prior disruptions and incidents need not have happened in the "context of classroom instruction" to be relevant. See Phillips, 987 F. Supp. at 493. In fact, a prior incident does not have to occur at school to be relevant. See West, 206 F.3d at 1362 (Ku Klux Klan distributing flyers off-campus); Melton, 465 F.2d at 1335 (citywide curfew); Phillips, 987 F. Supp. at 490 (fight occurred between students at restaurant off campus). Similarly, a school may rely on past racial incidents that do not involve the Confederate flag. D.B. ex rel. Brogdon v. Lafon, 452 F. Supp. 2d 813, 818 (E.D. Tenn. 2006) (holding Tinker does not require a "direct causal connection between the expression and disruption."). Additionally, the plaintiff's interpretation of the Confederate flag's meaning is largely irrelevant because courts recognize that it is racially divisive in nature. Briggs v. Mississippi, 331 F.3d 499, 506 (5th Cir. 2003) (observing "it is common knowledge that public reaction to and the debate over" the flag "has been virtually exclusively in relation to ... whether or to what extent this symbolism extols or excuses slavery, racial oppression or resistance to racial equality."); see Scott, 324 F.3d at 1249 (stating that "the [C]onfederate flag is a symbol that has acquired numerous racist associations to the point that the flag itself has understandably come to be perceived as a racist symbol."); United States v. Blanding, 250 F.3d 858, 861 (4th Cir. 2001) (stating many identify the Confederate flag as symbol of racial oppression and separation).

Upon consideration, the Court finds that Defendants did not violate the First Amendment because they had reason to believe that students displaying the Confederate flag would cause a substantial and material disruption. Sanders testified that he believed the urination incident, the September 2005 fight, and the December 2005 fight were racially motivated. (Sanders Dep., Doc. No. 31 pg. 8; Sanders Dep., Doc. No. 33 pg. 15-16). Furthermore, Defendants have provided two affidavits showing that the urination incident and the September 2005 fight were motivated by race. (Reid Aff., Doc. No. 31 ¶ 6; Welch Aff., Doc. No. 31 ¶¶ 6-8). Sanders also testified that the December 2005 fight led to an OCR investigation. (Sanders Dep., Doc. No. 31 pg. 25). The urination incident and the September 2005 fight prompted two black students to leave the district. (Sanders Dep., Doc. No. 31 pg. 11; Welch Aff., Doc. No. 31 ¶ 10-11). Sanders testified that the Festus newspapers criticized the District for its handling of race relations. (Sanders Dep., Doc. No. 31 pg. 24). Moreover, there were various incidents at Farmington High where students used racial slurs and hate speech. (Barber Aff., Doc. No. 31 Ex. 2). Against this backdrop, the Court cannot conclude that Defendants banned the Confederate flag because of nothing more than an "undifferentiated fear or apprehension of disturbance." Tinker, 393 U.S. at 508.

In response, Plaintiffs assert that there is a genuine dispute of material fact because the District's official investigations into the three incidents were inconclusive. In effect, Plaintiffs are interpreting Tinker to require that schools conclusively prove an incident is racially motivated before banning a racial symbol. This interpretation overstates Tinker's requirements. See Jeglin ex rel. Jeglin v. San Jacinto Unified Sch. Dist., 827 F. Supp. 1459, 1462 (C.D. Cal. 1993) (upholding ban on clothing the school believed to be associated with gangs even though it could not prove size and composition of gang). Tinker only requires that school officials "had reason to anticipate" a material and substantial disruption. Tinker, 393 U.S. at 509. Additionally, Plaintiffs' standard would prevent

a school from policing the attire of its students unless it can conclusively show that a incident occurred and all parties admit that it was race-related. Tinker does not mandate such a surrender of control of the "public school system to the public school students." See Tinker, 393 U .S. at 526 (Black, J., dissenting).

Plaintiffs also assert that no disruption occurred when Plaintiffs wore the Confederate flag, that the three incidents did not involve the Confederate flag, and that the three incidents did not occur at Farmington High. As previously stated, these reasons do not compel the Court to rule in Plaintiffs' favor. See West, 206 F.3d at 1362 (Ku Klux Klan distributing flyers off-campus); Melton, 465 F.2d at 1335 (citywide curfew); Lafon, 452 F. Supp. 2d at 818 (other racial incidents are relevant); Phillips, 987 F. Supp. at 493 (holding that wearing Confederate shirt without incident was an insufficient basis for finding that the school did not have a reason to believe disruption was likely). Thus, Defendants did not violate Plaintiffs' rights by preventing them from wearing Confederate flag clothing.

## II.     The Dress Code is not Facially Unconstitutional

Plaintiffs also allege that the District's dress code is unconstitutional because it is "overbroad, subjective, applied on an ad hoc basis, and is viewpoint discriminatory."(Am. Compl., Doc. No. 20 ¶ 40). The Court interprets this claim to be a facial challenge to the dress code.[10]

A facial challenge to a law is "the most difficult challenge to mount, since the challenger must establish that no set of circumstances exists under which the [law] would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). Although courts generally will pass upon facial challenges, there is an exception for First Amendment challenges based on overbreadth. See Los Angeles Police Dep't

---

[10]To the extent that Plaintiffs make an as applied challenge, it also fails. Specifically, the Court has already determined that Defendants' ban on Confederate flag related clothing fulfilled the Tinker substantial disruption standard, which the dress code clearly adopts.

v. United Reporting Publ'g Corp., 528 U.S. 32, 38 (1999). Courts consider this doctrine a last resort and apply it only when "the law may have a chilling effect on the free speech rights of those not before the court." West, 206 F.3d at 1367 (citing United Reporting Publ'g Corp., 528 U.S. at 38-39). A facial challenge fails when there is no "realistic danger" that the law will "significantly compromise recognized First Amendment protections of parties not before the Court." See Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 801 (1984). Here, the dress code's language tracks Tinker, meaning there is no real danger that it compromises the First Amendment rights of other Farmington High students. Thus, Plaintiffs' facial challenge is denied.

## III.    Defendants Did Not Violate Missouri Law

Finally, Plaintiffs claim that Missouri law requires this Court to find that they could wear the Confederate flag to school. The relevant provision states:

> No employee of or volunteer in or school board member of or school district administrator of a public school or charter school shall direct a student to remove an emblem, insignia, or garment, including a religious emblem, insignia, or garment, as long as such emblem, insignia, or garment is worn in a manner that does not promote disruptive behavior.

Mo. Rev. Stat. § 167.166.7 (2005). This provision was enacted as part of a statute regulating the strip searching of students by school officials. See 2004 Mo. Legis. Serv. 969. Specifically, Plaintiffs claim that because they did not wear the Confederate flag "in a manner" that promotes disruption, Defendants violated Missouri law by preventing them from wearing it.

Again, Plaintiffs make a novel argument because no Missouri court has interpreted this statute. In Missouri, the primary rule of statutory construction is to "determine the legislature's intent by considering the plain and ordinary meaning of the words used in the statute and by giving each word, clause, sentence, and section of the statute meaning." Neske v. City of St. Louis, 218 S.W.3d 417, 424 (Mo. 2007). When determining intent, courts are to look at the whole act and its purposes

and to avoid unjust or absurd results. State ex rel. Killingsworth v. George, 168 S.W.3d 621, 623 (Mo. Ct. App. 2005). Furthermore, policy arguments are useful "in the face of an ambiguous statute." State ex rel McDonald's Corp. v. Midkiff, 226 S.W.3d 119, 126 (Mo. 2007).

Upon consideration, the Court finds that Defendants did not violate Missouri law. Section 167.166.7's plain language allows a school official to prevent a student from wearing an emblem in a manner that promotes disruption. In some cases, such as the present case, the language "in a manner" will include the mere wearing of an emblem, because, although passively worn, it will, or is likely to, promote disruption at the school. Furthermore, the Court doubts that § 167.166.7 is an attempt to circumvent almost forty years of Supreme Court precedent. Finally, one commentator suggests that § 167.166.7 was enacted mainly to protect the wearing of passive religious symbols, such as headscarves or skullcaps. See Note, French Headscarves and the U.S. Constitution: Parents, Children, and Free Exercise of Religion, 12 Cardozo J. L. & Gender 341, 354 n. 115 (2007). As such, Plaintiffs Missouri law claim will be denied.

## IV.    Plaintiffs' Claims for Injunctive Relief are Denied

Finally, the Court must determine whether to issue to issue injunctive relief. Plaintiffs seek both preliminary and permanent injunctive relief. The Court weighs four factors when determining whether to issue a preliminary injunction: (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury granting the injunction will inflict on other parties; (3)the probability that movant will succeed on the merits; and (4) the public interest. See Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981); Forest Park II v. Hadley, 336 F.3d 724,731 (8th Cir. 2003) (noting that the Dataphase factors have been adapted to review a permanent injunction). Here, no injunction should issue. Plaintiffs can show no probability of success on the merits. Additionally, an injunction will prevent Defendants from properly running the District, which

harms not only the District and its students, but also the public. As such, Plaintiffs claims for injunctive relief are denied.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 31) is **GRANTED** and Plaintiffs' Claims are **DISMISSED**. A separate order of dismissal will accompany this order.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Oral Argument (Doc. No. 34) is **DENIED**.

Dated this 10th day of August, 2007.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE